I'm going to ask those lawyers that are going to be presenting oral arguments to first step up to the podium and identify yourselves for the record. Good morning, Your Honor. James H. Fort from the firm of Sager LLC admitted pro hoc in this case to argue this appeal on behalf of the plaintiffs of Metropolitan Capital Bank & Trust. Good morning, Your Honor. Patrick Williams on behalf of the appellees Engstrom and Rothman. Before you sit down, we have a number of students here to observe. And perhaps, Mr. Schwartz, you could say or explain into the record and speak up and explain to them what pro hoc v. J means and why you're allowed to present. Good morning, Your Honor. The reason why I admitted pro hoc is I think that the plaintiff wanted an opportunity to work with a lawyer that had had its most military. I practice in New York and in New Jersey. I have known Metropolitan many days, in house and council meetings. I've worked with Jeffrey Schreier, who's sitting in council with me, for many years. We've worked together for 33 years. So he asked that I be admitted for this time only, which is what pro hoc v. J means, just for the purpose of this argument. And that's why I'm here today. All right. Thank you, Mr. Schwartz. So with that, I'm going to advise both of you that you will have about 15 minutes to present oral argument. And from that, Mr. Schwartz, as appellant, you will have some time for rebuttal. All right? Okay. Mr. Williams, you may be seated. And good morning to everyone. May I approach you, Your Honor? Yes. Good morning. Good morning. I am here today with Michael Educate, excuse me. I promised I would not mispronounce his name, and I've already done it. He is our local counsel here today. And I have with me from the bank Jeffrey Schreier, who is an officer at the bank. As I stated, I represent Metropolitan Capital Bank and Trust, and I'd like to reserve a few minutes of my time for rebuttal. You may. Now, the bank appeals from an order of the circuit court dated June 30, 2022, which, based upon a prior order of the circuit court dated September 19, 2019, dismissed the bank's complaint on a motion for summary judgment. And we believe the circuit court's order and the interlocutory order of September 19, 2019, was incorrect in at least two respects. First, although the circuit court acknowledged that there had been a breach of the forbearance agreement that is the subject of this case, the circuit court did not award the bank the damages that are set forth in the forbearance agreement, which is the amount of the outstanding indebtedness of Defendant Rahman, which was approximately at that time $4 million. Let me interrupt you right away. Sure. So the brief suggests that the balance after the sale of property in San Francisco then became about $767,000. Neither of the briefs really tell us, unless I missed something, they don't tell us how much that property was sold for in San Francisco and how much it took off from the money owed. I think that calculation is set forth in the affidavit of Jerry Frum on the bank's initial motion for summary judgment. And I believe the amount of that sum was approximately $3.2 to $3.3 million. Okay. So the property that was sold in San Francisco perhaps was close to, or maybe not close to, but close to $3.2 million? Approximately. Okay. And was that the fifth agreement of the balance at that time? Was it around that same amount of money? I believe that to be correct, Your Honor. All right. But either way, there's money owed. That's correct. That's what you're arguing. So why not file a response to the summary judgment motion indicating the money is owed? The reason why, and I've addressed this with the counsel that represented the bank at the time, the reason why is that the counsel viewed what the situation was in terms of the procedural history as fait accompli. Let me explain that. Basically, what Judge McGrath did on September 19, 2019, in her order, and the oral argument on the record, is she indicated that the bank would not receive the amount of its liabilities as set forth in the forbearance agreement. The bank had to show damages specifically accruing from January 1, 2019, through July 1, 2019. And she expressed doubt that the bank, in fact, could do that, and the bank does not claim that it has any damages outside of the outstanding liabilities. It has never claimed that. So basically, the judge put the bank in a position where, although it granted summary judgment on liability, it made a ruling such that the bank was in a position where it had to prove damages that it couldn't prove and didn't argue were in the case. What it argued was that we were entitled to get paid the outstanding indebtedness on the loan, plus interest, fees, attorney's fees, and the like. That was not an argument that Judge McGrath agreed with. But we went back into court about 13 months later on a renewed motion for summary judgment before Judge Otto, because I understand Judge McGrath retired, and Judge Otto didn't even hear the motion. It denied the motion and said, your motion's denied. I'm not scheduling it for oral argument. And the reason why is because you've already made these arguments, and Judge McGrath has ruled that this is where you have to show damages, and that's what you need to prove. So on the third time around, when my adversary made his motion, renewed motion for summary judgment, the bank said, we don't have any damages. If this is where the court is, the only remedy we're going to get is on a P, because we've made arguments twice. We did it on the first motion. We made it on a renewed motion for summary judgment, and both times they were rejected. So you're saying that you don't claim, and you never did claim, any damages between that January and July when the other payment was made? That is correct. We claim only damages in the form of an interest accrual on the liabilities, but, you know, that is not substantial. We did not have damages. The judge was looking for damages specifically tied to the failure to pledge the collateral. The judge was refusing to enforce the agreement that said, if you breach the agreement in any way, we are entitled to recover our liabilities. And the judge rejected that in the decision. And Maven said, you're an issue of fact, and she said, maybe you have damages, maybe you don't, I don't know. Well, the language of the agreement did say, in the event of a breach, default, or noncompliance with the terms of the forbearance agreement by the obligors, the bank's agreement to temporarily forbear shall terminate automatically without the requirement of any demand, presentment, protest, notice, or further action by the bank. All right. Well, we'll see what counsel has to say about whether or not there was any breach, default, or noncompliance. I mean, your position is clearly there was noncompliance. I would just add. There didn't have to be a breach. There didn't have to be a material breach. If there were anything such as a breach, default, or noncompliance, it had to be considered. And I'll yield to the podium if you want me to yield the podium to. No, no. We have some other questions for you. I can't get off that easy. That's fine. But I would add, Judge, to what you said, that on the record, on the motion for summary judgment, the initial motion for summary judgment you made, Mr. Williams admitted there was a breach. He said, I cannot argue there was not a breach. Okay. I have another question about Ms. Engstrom. Yes. I don't seem to find any differentiation between her and Mr. Rama. And so how do you attach, or what are the damages vis-a-vis Ms. Engstrom, who was not a party to any of the previous contracts? Technically, she was a party, but I agree. To the other five previous? As a pleasure. Okay. So if we grant you a request, what happens to Ms. Engstrom? We've got to sit him out on the judgment. Fair enough, Judge. In answer to your question, we believe a reasonable reading of the forbearance agreement would render her liable for the exact same damages. In Section 1A and in Section 1D, she acknowledged that the agreement and the loan documents are valid, legal, and binding obligation on the obligors of which she was one. And you said that would be a reasonable interpretation?  Well, that screams out for questions of material fact, if I'm not mistaken, under case law, that for us to suddenly say that's a reasonable interpretation, I don't see how we would get to that. Judge, if that is the issue of fact, then we're happy to produce evidence on a remand on that issue. But you had your chance as to both parties in front of Judge Otto, didn't you? Didn't you already have your chance as far as Ms. Engstrom and Mr. Rahn? And I apologize if I'm not saying correctly. Not really with Judge Otto. Judge Otto did not hear our second or renewed motion for summary judgment. He refused to hear it. And then when my adversary made a motion for summary judgment, he argued, and we believe correctly, that there was one issue left, whether we had damages in what they call the forbearance agreement, January 1, 2019, through July 1, 2019, but not that we were entitled to the liabilities because my adversary believed and we believed as well that the judge had decided that issue against us and we were not going to receive the liabilities, in essence, the amounts due and owing under the loan documents as damages in this case. I have a question about the stock, Jawbone and stock capital stock. Yes, sir. So Mr. Rahn and Engstrom were supposed to pledge the $300,000, correct? Yes. All right. And so doesn't that suggest that the stock pledge was intended solely to secure the $300,000 payment? I don't believe so. I certainly – there is certainly language in the agreement that you could read that way, but not if you read the entire clause. The entire clause indicates that the ALFCOM and the social capital stock, assuming that the – and you only get to the social capital stock if ALFCOM was not pledged. That was in consideration for the diminution in value of – I said ALFCOM. I should have said the Jawbone and social capital stock. It was being pledged in consideration of the diminution in value of the ALFCOM stock that had already been pledged. And if Your Honor goes to the last page of the forbearance agreement, it sets forth the events of default that led to the forbearance agreement. And one of those events of default was that they were required to pledge additional stock to cover the shortfall from the diminution in value. So I have a question following up on that, because if he is – is he required to own the stock? Because in his discovery responses, it appears that he didn't own the stock when he entered into the agreement and throughout. From our view is the answer is yes. I mean, you cannot agree – Yes, so he's supposed to own it? Well, you can agree to formalize – Pledge something you don't own. Yeah. Let me ask you this about debt in particular. Okay. Didn't the agreement provide that if the stock were not pledged by January 1, 2019, that then the $300,000 payment was due? Am I missing something? You could view that as a payment default, depending as well. Well, I – my question is this. I thought the agreement, the forbearance agreement provided that the stock had to be pledged by a date certain, January 1, 2019. And if it were not pledged, then the $300,000 that was due in June or July would have been then due in January. And when it wasn't paid, that's when the lawsuit was filed, the beginning of March or something. I agree with Your Honor in that respect. I do. Well, so then are there not damages for that loss of the money that you would have – well, whatever. I'm trying to grasp your suggestion was that you've always simply been claiming that the damages arose from this default or noncompliance or what have you, but it all was tied to the money still owed on the previous five or so, whatever, agreements. Well, to be – I think in Section 3 of the forbearance agreement, the damages are set forth therein. It says if you don't – if there's any breach, any default, any noncompliance – All the money is owed. That's correct. Okay. All right. So that's why you took that position in front of Judge McGrath. You took that position in front of Judge Otto, who did not recognize it or didn't feel it was obvious. I don't know. And then they filed a motion for summary judgment, which Judge Otto granted. That is absolutely correct. All right. That's the procedure listed. So how much is actually due and owing now or today? I can only tell you as of the time that we followed the renewed motion for summary judgment. It was $469,000, and that's in the record as of October 30th, I believe, 2020. But you can imagine that there's been substantial attorney's fees and also interest that has accrued on that sum. Okay. One other question. Regarding Joyce v. Fidelity, are there any other cases regarding forbearance agreements in Illinois? No. No? That I could find. I actually looked even beyond Illinois, and I found the Easter Day case. I understand it's an Oregon case and from the District Court of Oregon. But it followed the exact same analysis. Didn't cite Joyce, but it was the exact same analysis. Any breach will do. And basically puts the onus on the borrower to step forth. If you want a material breach to trigger the damage, then negotiate for it. But don't have a language in a forbearance agreement that says any breach or the breach of any provision will trigger these damages and then argue it needs to be a material breach. All right. Anything further? All right. We'll give some time for rebuttal. Mr. Williams? May it please the Court. Good morning. My name is Patrick Williams. I'm the attorney for Hossein Rahman and Alicia Angstrom, husband and wife. There are three key elements to the defendant's arguments. And, Justice McBride, you raised one of them right out of the box. That is that Metcalfe did not respond at all to the motion for summary judgment. They did not file their own motion for summary judgment. This was all after Judge Otto allowed both written and oral discovery to occur. But what about his statement, counsel's statement to this Court that the forbearance agreement provides for the damages by way of any default that will then require that all monies due on the previous, you know, loan agreement? It has to be a material default, Your Honor. Otherwise, you're writing material out of the wall. But where is material in the agreement? And let me just go back to the language of this document that says in the event of a breach, default, or noncompliance with the terms of the forbearance agreement by the obligors, the bank's agreement to temporarily forbear shall terminate automatically. So how are we adding something? There's no word material there. Well, I believe that, again, effectively you are writing the notion of materiality in terms of breach. Okay, but what about noncompliance? I mean, isn't that kind of just don't we interpret that word as it's generally understood? And when you didn't pledge the stock, or your client, rather, didn't pledge the stock, why isn't that noncompliance? Well, again, if that was the law, then any footfault would result in a trigger. Okay, when you say that that were the law, this is an agreement. It's a contract. We interpret it the way the parties have written it. So I'm not sure what you mean by it being the law. Is it your position that this contract is something that you can interpret, but then you've got to apply this material breach to it as well? So the fact that they have specific terms in the contract is somewhat irrelevant? No, I'm saying that the law and the cases that have interpreted it. So it doesn't matter what they contracted to, because you're always going to apply this material breach standard. I believe that the Ballsy case and even the notion that Judge McBride brought up, the de minimis non curat lax. That was Judge McGrath, not me. I know why. McGrath has retired. He was the first grand summary judge. Right? Right. I just didn't want to be confused. Well, but again, in Judge McGrath, in that rule, there was a dismissal of the complaint or a denial of the claims being brought. She denied summary judgment. She said that there were genuine. Genuinely, she didn't ask for damages. Here's my question. Were the stocks pledged? No. Was that noncompliance? Was it noncompliance? I submit that it would be noncompliance if the payment wasn't made. Because this pledging of the stock, I mean, we have to connect all the dots. The pledging of the stock was intended to secure the payment of the $300,000 on July 1. But wasn't the agreement such that you can let me know if I have the interpretation wrong here. The pledge was supposed to occur in January 2019, the pledge of the stock. If the payment wasn't made on January 1. I thought it was just the other way around. The stock had to be pledged by January 2019. No. When was that due? If the payment, the $300,000 wasn't paid on January 1 of 2019, then the payment was extended to July 1 of 2019. But as part of that extension, stock, job loan, social capital had to be posted for the. This is pivotal. This is pivotal. It had to be posted as additional collateral, not for the indebtedness, but for the $300,000. Was it pledged or not? Was it ever pledged? The stock was not pledged. Okay, so the payment was due. No, the payment was due. The payment wasn't made and the stock wasn't pledged. And again, the payment could have been made on January 1. Okay, I do not agree with the notion that a default occurred on January 1 when the payment was not made. Because the agreement says, paragraph A on page 3, that the sale proceeds were required to be made by July 16, 2018. And the 2019 payment is to be made on or before July 1 of 2019. And if those two payments aren't made, that shall constitute full payment of the entire indebtedness, period. So what was secured for the $300,000? If you didn't pledge to stock, the clients didn't pledge to stock, then what collateral was provided to the bank in case there wasn't payment on July 1? There wasn't. And Justice, that's exactly where I think Judge McBride came in. Judge McBride. Excuse me. Don't you be confused with Judge McBride. Where Judge McBride came in and said, okay, what damages have you suffered because you didn't pledge to stock? I want to know. And if you demonstrate damages, then you have a claim. But I can't tell that from now. So some of the judgment is denied from now. Okay. And that's precisely what they had the opportunity, what Metcalfe had the opportunity to demonstrate. And maybe, you know, again, what damages did they have? They had a reporting requirement with some federal regulatory agency in terms of what their loan status was. Could I ask you something, Mr. Williams? Would you say it would be unreasonable to say that the essence of this forbearance agreement was that, all right, we're going to extend credit to you again. But if there's any breach, default, or noncompliance, then the entire liability shall be due. I think that's a pretty global statement. Well, I mean, in essence, there's a provision in the contract, the forbearance agreement, that says essentially that. Doesn't it? Doesn't it say if there's any breach, default, or noncompliance with the terms? And again, Your Honor, I think that this will temporarily, the forbearance shall be automatically terminated without any requirement of demand, presentment, protest, notice, or further action, I think. I think you have to look. I mean, I don't know if that's, I'm not making it global. I think the parties did. Well, Your Honor, again, I think we have to go into the weeds to a certain extent. I think we have to go into the weeds. All right, let's just go into the weeds. What exactly was this property in, I just want to know, what was the property in San Francisco sold for? And how much was then paid off against the larger? Judge, I believe that the numbers, again, I don't have the specific numbers. Somebody's got to know, a ballpark figure. No, no. The ballpark figure is that the $300,000, if it had been paid, would have satisfied virtually all of the debt except for some interest and penalty figures and attorney's fees. Okay, so that property in San Francisco was quite, was sold for, what, over $3 million? That's my understanding. And so that took down the actual amount that was owed considerably. Right. And so you, the parties here today are disputing something in the neighborhood of $700,000 minus $300,000? I think your calculation is correct. All right. Good to know. But again. As long as we're crunching numbers. Okay, well. Because it's not really clear, but, you know, that was a substantial chunk of the amount of money owed. All right. Well, the second point I've already talked about, the forbearance agreement required the two payments. Yes. Those two payments were made. Yes. The two payments were paid timely according to the terms of the forbearance agreement. And we submit that the failure to pledge the stock, the Jawbone and Social Capital stock, to secure, again, to secure the payment of the $300,000 was rendered moot. Now, counsel has stood before you this morning and said there were no damages. We concede. No, he said, he did not say there were no damages. He said there were no damages between January 19 and July 2019. And he says counsel said their damages were those all monies owed, attorney's fees, interest that was remaining on the outstanding liability. I didn't get a chance to finish. All right. You may finish. You finish formal. All right. All right? Yes. And agree. But the fact of the matter is that none of that was presented to Judge Otto. And we all understand. But they're saying that they didn't get an opportunity to present it to Judge Otto. That Judge Otto didn't want to even hear an argument on it. That's not, no, no. That's what they were saying this morning. Well, actually, we're talking about three motions for summary judgment, Your Honor. Okay. Justice Reyes. The first motion is the McGrath motion, where she denied the cross motions. The second motion was in front of Judge Otto, which we submit was identical to the one that Judge McGrath had denied. And that's why it was denied. Basically, you're throwing out the same thing, wanting me to be your appellate court. That's my understanding. The third motion for summary judgment, that occurred only after Judge Otto allowed written discovery, oral discovery, the opportunity for the METCAP to file a motion for summary judgment, and for, obviously, Hossain and Alicia to file their motion. They didn't file their own motion for summary judgment, their motion for summary judgment, and they never responded to ours. In the Brandeis case that we've cited, it's incumbent upon the plaintiff, it's the plaintiff's burden to respond to the motion for summary judgment. But they're claiming that Judge McGrath's initial summary judgment ruling was in error, that she's the one that made the initial error, that the damages weren't about January 2019 to July, but the damages were the liabilities remaining from the original default on the prior, whatever, extensions of credit. And again. And that's what they're arguing here today. Right. If McGrath got it wrong, then what do you say? Well, I don't necessarily agree with that. They could have raised it in front of Judge Otto and said, we have a genuine issue of material fact as to whether or not the, now the discovery has been completed, that whether or not there were damages sustained. And it is the first time this, as I said this morning, that I heard that they have conceded that there were no damages. And they could have done this back in front of Judge Otto when he said, you guys want to file summary judgment motions. Oh, Judge, we want to take this up right now. But Judge Otto actually said, I'm not going to hear your summary judgment motion, because Judge McGrath already ruled against you. Judge, again, that is the motion that was brought before discovery occurred. Okay. The motion for summary judgment that Judge Otto, Judge Otto rendered a written opinion based on the brief that may have been filed and the evidence that we had presented, which included the interrogatory answers from the written discovery, the deposition transcripts where the two representatives from Metcalfe said, we can't identify any damages that we sustained. Okay. Let me just ask you this one question. Let's assume for purposes of argument that there was a, and I'm not, you're not suggesting this. I know it's not your interpretation. But let's assume there was a breach or noncompliance or whatever that third word was. Would you then agree that the amount of money, default, yeah, Would you then agree that the amount of money owed was whatever was left over on the liability from the initial loans that were extended? Well, I can't jump into that hypothetical, Judge. No. Well, I would agree. I would agree. If there were a breach, a default or noncompliance, does the document itself then envision that whatever liability was left over after the payment of the San Francisco property and the $300,000, that whatever was left on the liability would be that owed? But for the language that said that if they paid the $300,000 by July 1st, the debt is satisfied. Okay. We can't read that out of the agreement. And again, And what provision in the agreement says that so long as the $300,000 is paid July 2019, no further liability or amount of money is owed? Give us the point of the record. We're in the agreement that that's the answer to the question. Well, again, I think One paragraph in the agreement Section Roman numeral 1 agreement. I'm sorry, Roman numeral 2. Subparagraph A. Starting about halfway down, lender hereby agrees that lenders receive both of the following payments, the sale proceeds on or before July 16, 2018, and the 2019 payment on or before July 1, 2019, shall in the aggregate constitute payment in full of the principal amount of all approved and unpaid interest on and other fees and costs and expenses owed with respect to the existing indebtedness of the borrower to the lender arising with respect to the loan documents. All right. And your position is that there were no breaches of any material kind, no breaches of any default of any material kind, no noncompliance of any material kind, so that when that payment in July was made, your client was off the book. Is that your? Yes. All right. What about Ms. Engstrom? What is your position? Well, that's a good one, Judge. I don't know where they're coming at from her. You asked the question. Yes. She never signed any of the loan documents. She never was a party to any of the prior amendments. She was brought into this forbearance agreement for one purpose. That purpose was the San Francisco property. She was the co-trustee of that property, and they were required to pledge the property because it had gone into nonjudicial foreclosure. And in terms of the whole unwind, it was incumbent upon her to join. More importantly, their complaint, their complaint said we want, because of the breach, you know, their allegation was because of the breach of the forbearance agreement, Alicia Engstrom is responsible for $300,000 plus interest fees and whatever. But that was paid. That $300,000 was paid. That's exactly right. Your position is if nothing else, Engstrom should be off the hook. Absolutely. That is a slam dunk, and I almost hate to say that with respect to anything that involves the law. All right. But, again, you mentioned it a moment ago, Your Honor, and I think it's important that an analysis of materiality be considered. The Joyce case, even though Minnesota, Massachusetts law was involved, it talks about the elements necessary that I think are articulated in the Commonwealth Edison case. There's five of those five elements in terms of the materiality of the breach. And the case that Judge McGrath referenced, the right of the stock. Why isn't the pledging of the stock a material breach? It was to secure the amount of monies owed. It was a requirement of this agreement. How can you argue that it wouldn't have been material? Why was it in there? Why would the parties include something that was silly, frivolous, or not material? Because I think the purpose of the – we talked earlier, Your Honor, about, you know, this global concept of this forbearance agreement. Well, I'm just – I didn't make the global concept. I took the words directly from the agreement. The forbearance agreement, I submit, was intended to secure a $300,000 payment plus the proceeds from the California home. But why were these provisions included if they weren't important or material? I'm not saying they weren't important. How about material? What's the difference? Well, material is specific. The Commonwealth Edison case talks about the extent to which the injured party will be deprived of the benefit that he or she reasonably expected. Payment is due on July 1. The stock was not paid or unpledged, but the payment was made. Two, the extent to which the injured party can be adequately compensated for the part of that benefit to which he or she will be deprived. I think that's Judge McGrath. What happened? How were you hurt? Three, the extent to which the party failing to perform or offered to perform will suffer forfeiture. I submit that, yeah, this is the footfault notion. This is this notion that the Balzi case talked about, that the law does not favor forfeitures. And what is the inherent injustice here to the parties? And to say that the pledging of the stock, which was to secure a payment which was made anyway, should somehow expose the two of them, according to counsel's figures, to the tune of $460,000, I submit is outrageous. The likelihood that the party failing to perform or offer will cure his or her failure, taking all considerations, including reasonable assurances, that the payment was made. The extent to which the behavior of the party failing to perform or offered to perform comports with standards of good faith and fair dealing. The payment was made, and there's no notion here, as I see it, of anything, of any impropriety in terms of the tender of the payment or the offer to make payment or any chicanery in terms of the failure to perform. But you're really asking us to write out a provision because you say it wasn't material. You're saying we have to ignore it. You don't have to pledge anything. It's gone. I would agree with you, Your Honor, if the payment wasn't made timely. I would agree. Or, better yet, consider this. If the pledging of the stock, jawbone and social capital, was not intended to secure payment of the $300,000, what if it was intended to secure the payment of the indebtedness? Now, I think there you've got an argument. You know, I've got a much tougher case in terms of that. But that's not what we have here. That's not what we have here. And I submit that in considering the materiality factors, considering the notion that the law does not support small things, the law does not support footfalls or forfeitures, I think that the court should affirm the summary judgment and the summary judgment order by Judge Austin. I have a question. In your brief, Exhibit G, attached forbearance agreement, which it says it was entered into on July 1st, 2018. And on the back, Ms. Engstrom signs it indicating that she is an obligor individually responsible under the forbearance agreement. But you said that she didn't sign anything. Your Honor, I said this is the only agreement. She never signed any of the other loan documents. There were loan documents that had gone back and forth. I think this was the second forbearance agreement. She didn't sign any of your notes. She signed no note, no amendment to the loan agreement. As I say, she signed only this forbearance agreement. Okay. By virtue of the fact that the San Francisco property was owned by the two of them, and she was a co-trustee, and in order to pledge or to secure the payment out of those proceeds, she had to join in the forbearance agreement. Did you say this was the second forbearance agreement? I believe there was an earlier forbearance agreement. Oh, okay. That's new. It's not in the briefs. I mean, I knew there were five previous grants of credit, whatever you want to call them. Amendments? Yeah. Yeah, there was amendments to each one. I believe there was, Your Honor. All right. If I misspeak on that, my point to your question, Justice Reyes, is there was no other document ever signed by Alicia Angstrom other than the document that is the subject matter of the litigation. Anything further? Not unless you have something, Judge. No, I don't have any other questions. All right. Thank you, Mr. Williams. And now we'll let Mr. Bork briefly respond. Judge, Your Honors, I'll be very brief. We ended, or the argument just ended with Ms. Angstrom not signing any other documents other than the forbearance agreement. The loan agreement is made part of the record. It is A11 through A87 on the last page is the signature of Alicia Angstrom. Albeit it's pleasure, but she signed on to the loan agreement. So just say otherwise. She signed on to the loan agreement or the forbearance agreement? The loan agreement. Okay. And by the loan agreement, do you mean the note? No, she did not, Your Honor, sign the notes. Okay. The loan agreement set forth the overall nature of the loans and the responsibilities of the parties. The notes were the underlying instruments for the payment of the monies that were due in them. Okay. In addition, with reference to what Judge McGrath did or did not do, I wanted to quote language from my adversary's summary judgment motion before Judge Otto. This is, quote, the sole issue in this case has been limited to whether plaintiffs suffered any damages between January 1, 2019, and July 1, 2019, as a result of Rahman's failure to pledge certain stock as collateral. That is exactly what we have been saying throughout. The judge didn't just simply deny summary judgment. The judge limited the bank in terms of saying the bank was not entitled to collect its liabilities upon an event of default. And the clear language of Section 3 for the termination of the forbearance agreement that Judge McBride read a number of times, we fall squarely within that language. So we don't think there's any doubt that we were entitled to collect the liabilities, but unfortunately we didn't have a receptive audience to that argument, and that's why we're here. In addition, I want to, as to the waiver argument, I wanted to address very— What damages are there to or against Ms. Engstrom? Isn't she tied to the forbearance agreement and really nothing else? Other than the loan agreement, I would agree with Your Honor. That is correct. And I read the only two provisions that we rely upon in the forbearance agreement, Section 1A and Section 1D. If that is not sufficient in this Court's review, then we do not have a viable claim against Ms. Engstrom. It's really that simple from our perspective. Going back to the reiteration of the facts that you provided us, you said that Judge Otto would not hear the motion. So in counsel reference, there was actually three, right? There was the first, the second, and then the third after discovery. So which one was it that Judge Otto refused to hear argument on? Judge Otto, the motions two and three were in front of Judge Otto. The first was in front of Judge McGrath. Judge Otto refused to hear motion two, our motion for summary judgment. And, in fact, in response to our motion, the defendants made a motion to strike our motion, saying there's nothing new here, Judge. It shouldn't be heard. Strike it from the calendar. And the judge simply denied the motion, saying that this has all been decided by Judge McGrath's order. So you're not going to get your liabilities paid as a result of this default. And you're going to have to specifically show damages within that narrow time frame. And that's a good segue to the issue of where I think, where I disagree with my adversary and Judge McGrath in a more global point of view. My adversary keeps talking about the July 1st payment was made timely. No, it was not. The reason why is once there's a breach in January 1, the forbearance agreement is over. It's terminated automatically without any further action on our part. There's no July 1 payment. There's no right to cure in the agreement. They are now just responsible for the liabilities. That's what the agreement provides. So to say that they made the July 1 payment and we have to show damages during the forbearance agreement, there is no longer any forbearance period. The forbearance agreement terminated upon the breach, which is the failure to provide the collateral. So that is our position, and that is why I think there's somehow a notion that this forbearance agreement may continue to live on after January 1 and the breach, but it did not by its own language and terms. The only case that Judge McGrath and my adversary have cited is the Rogers v. Balzi case. I can't tell you a case that's probably more inapposite than this one. Let me just explain very briefly, and then I'll sit back down. In the Rogers v. Balzi case, that was a case involving the sale of a residential home. Basically, the parties agreed that there would be a buyer and seller. They agreed that the home would be sold, but the seller said, look, I've got another offer, and I'm going to have to figure out how to get rid of this other offer. And if I do, you know, then I'll sell to you. And there was also a mortgage contingency clause in that offer, in that contract in Rogers v. Balzi, and it provided that the buyer was entitled to satisfy that mortgage contingency clause, and if not, to walk away. Well, after about a month, the seller says, I got rid of the other offer. We're good to go. And then a letter comes back from the buyer's counsel saying the agreement's terminated because we can't satisfy the mortgage contingency clause. And so the argument, the seller filed suit and said, no, no, no. They can't terminate the contract on that basis because the contract provides that the notice of termination for failure to satisfy a mortgage contingency clause should have been paid or should have been sent to the seller himself, and it was sent to the seller's attorney. And so the court said, well, wait. Is it notice under Illinois law, notice to the seller's attorney, notice to the seller? And they answered that question, yes. And so they said, this is just, as my officer would say, a footfall, a non-material breach in that context, and that we're not going to require someone who couldn't get a mortgage to purchase a home to go through with a home purchase. That couldn't be any further from this case where collateral needed to be pledged, which we now know and learned in discovery that he never owned. Of course, we didn't find that out until after the forbearance agreement was signed. So as I said earlier, I believe that a fair reading of the clause relating to the pledge of the collateral is that it applied to all of the liabilities, not just the $300,000, because it specifically says in that clause relating to the pledge of the collateral, the preamble says the pledge is in consideration of the diminution of value of the existing stock that they held, the out-of-common stock. Well, obviously, if that is being diminished in value and the stock is there to, the new stock is there to replace that collateral, it would obviously have to secure the entire liabilities, as did the out-of-common stock. So that's our reading, and I believe that that is consistent with the language of the agreement. And I have no further... I have one question regarding the stocks. Yes, sir. So you're saying it was pledged. The counsel is saying that it wasn't pledged. Is there anything in the record that we can look at to make a determination one way or another if the stock was actually pledged? No, yeah. I may have said something confusing. What was pledged was out-of-common stock. That was pledged, and that had been pledged virtually all along. What they were supposed to pledge was jawbone health up stock or social capital stock, and they were to do that in part due to the diminution in value of the out-of-common stock, which was no longer sufficient to secure the liabilities. That they did not pledge the jawbone health up stock or the social capital stock, and that stock they did not even know. Okay. Anything? Anything further? Nothing, Your Honor. Thank you. All right. The case was well-argued, well-briefed. We will take it under advisement. The court stands. If the students can remain, we'll come back out and talk to them again.